**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**SHARONDA BROWN,**
1921 8th St. NW
Washington, D.C. 20001,

Plaintiff,

**V.**

**HOWARD UNIVERSITY HOSPITAL,**
2400 Sixth Street, N.W.
Washington, D.C. 20059,

and

**PALADIN HEALTHCARE MANAGEMENT, LLC**
222 N. Pacific Coast Highway, Suite 900,
El Segundo, CA 90245,

Defendants.

**Civil No. ____**

**JURY TRIAL DEMANDED**

**RETALIATION IN VIOLATION OF THE FEDERAL AND D.C. FALSE CLAIMS ACTS**

## I. PARTIES

1. Plaintiff Sharonda Brown ("Brown") is a resident of the District of Columbia, who at the relevant times prior to termination, was the Director of Nursing for Emergency and Trauma Services at Howard University Hospital ("HUH") in the District of Columbia.

2. Defendant Howard University Hospital ("HUH"), is a private, non-profit hospital located in the District of Columbia.

3. Paladin Healthcare Management, LLC ("Paladin") is a private corporation headquartered in California, which did business at HUH during the relevant period, including by a contract with HUH authorizing it to manage the Emergency Department.

## II. JURISDICTION AND VENUE

4. Defendants carried on their businesses in the District of Columbia

5. All of the events set forth in this complaint occurred in the District of Columbia.

6. This Court may exercise jurisdiction pursuant to the federal False Claims Act, 31 U.S.C. § 3730(h).

7. This Court may also exercise supplemental jurisdiction pursuant to the D.C. False Claims Act, § 2-381.02 et seq., and 28 U.S.C. § 1367 (respecting supplemental state law claims).

8. The United States District Court for the District of Columbia Superior Court is a proper venue for the claims set forth herein, because the relevant events occurred within the District of Columbia.

## III. EXHAUSTION OF REMEDIES

9. No particular administrative remedies need be exhausted under the statutes invoked herein.

## IV. JOINT LIABILITY

10. During all times at issue in this complaint, HUH contracted with Paladin to operate its Emergency Department.

11. HUH thus afforded Paladin employees the power to fire Brown.

12. Thus, as the HUH Chief Nursing Officer, Gloria Gammage, a Paladin employee, was Brown's immediate supervisor.

13. Dr. Lyn Everett, a Paladin employee, was the ED Medical Director and also a supervisor of Brown, through some time in October 2016.

14. HUH employed Brown, as she served its patients and was paid by HUH>

15. Paladin, however, possessed the practical power to hire and fire Brown, which it in fact exercised. Under the applicable statutes, both HUH and Paladin are proper Defendants herein for retaliatory discharge.

## V. FACTS

**Background**

16. Brown was hired by HUH President/Chief Executive Officer Jim Edwards as the Director of Nursing, Emergency and Trauma Service, on August 12, 2015, and entered on duty on September 24 of that year.

17. Paladin managed HUH ED while Brown was there.

18. During the relevant period in 2015-2016, HUH and Paladin routinely billed the District of Columbia for medical services pursuant to the Medicaid program.

19. During the relevant period in 2015-2016, HUH and Paladin routinely billed the United States for medical services pursuant to the Medicare program.

20. During the relevant period Brown was supervised by Paladin employee Gammage, the Chief Nursing Officer, who arrived in October 2015.

**<u>HUH/Paladin Acts Fraudulently, Including in Billing of Patients in ED Holds Status, Brown Blows the Whistle and Gammage Commences Retaliation</u>**

21. The American College of Emergency Physicians defines an ED/Hold or Boarded patient as a patient who is admitted to a facility, but nonetheless remains in the Emergency Department and has not been transferred to an impatient unit.

22. The Centers for Medicare & Medicaid Services (CMS) standards and conditions for participation require that in order to qualify for inpatient reimbursement, Emergency Department care and treatment of an ED/hold or boarded patient must be comparable to that which the patient would have received had he/she been admitted/transferred directly to an inpatient unit.

23. The specific requirements include:

-Implementation of inpatient orders
-Competency of ED staff to provide care treatment
-Access to inpatient services
-History & Physical
-Initial and Ongoing assessment

24. During the relevant period in 2015-2016, the HUH Emergency Department lacked the capability to adequately provide the inpatient level of care after admission to its medicare and Medicaid patients.

25. None of the identified CMS-services listed above were being provided to ED/Hold patients during Brown's HUH tenure, despite Brown's extensive efforts.

26. Nonetheless, HUH was unlawfully charging patients as admitted while they actually remained in ED/Hold status.

27. On March 1, 2016, Brown informed Gammage that patients and their carriers were being billed as if they had seen a physician, without actually ever seeing one.

28. Brown notified Gammage that physicians needed to assign themselves to the patient prior to or after the Medicare Medical Screening Exam, as close to real time as possible.

29. On March 16, 2016, during a break in the District of Columbia Department of Health ('DOH") surveyor's HUH visit, Gammage conducted a major meeting in the auditorium, and Brown was present. In the meeting, staff were ordered not to give too much information in an interview with regulator.

30. Later that day, Brown was on a facility tour with the DOH surveyor who inquired regarding safety concerns.

31. Brown informed the surveyor of both safety failures and improper billing practices.

32. Specifically, Brown informed the DOH official that patients were being charged for admission without actually being admitted or provided the services required for admitted patient reimbursement.

33. Brown further specifically notified DOH that HUH was engaging in Medicare fraud by billing excessively for procedures and billing procedures not actually performed, and then not notifying Medicare upon learning of such overbillings.

34. In addition to the overcharging infractions, Brown reported to DOH that the "physician" signing off on procedures was someone not licensed to practice medicine in the United States; she was licensed only in Nigeria.

35. Gammage heard this at the time.

36. After March 16, 2016, Brown continued to cooperate with D.C. DOH.

37. This angered Gammage.

38. On one occasion, for instance, Gammage called Brown into the office, such that just the two of them were present.

39. Gammage told Brown to "shut the fuck up" and to not provide the DOH inspectors with information.

40. Another time, Gammage verbalized her displeasure with Brown's protected reports to the Department of Health in the presence of Linda Jeffers (Director of Nursing- Medical Surgical) and Sandy Mavin – the Assistant CNO.

41. Gammage began investigating and surveilling Brown.

42. After the original DOH survey, still in March 2016, Brown provided Gammage with a proposed policy intended to fix the improper ED holds practices.

43. Brown and Gammage continued to participate in numerous meetings, at least monthly, at which DOH compliance was discussed and Brown continued to press for a cessation of HUH's unlawful practices.

44. On one occasion, HUH attorney Brenda Douglas accused Brown of talking too much, implying reference to the protected DOH disclosures and saying: "if Gloria wants your head on a platter she's got it right now."

45. Less than a month after the initial DOH visit in question, on April 12, 2016, Gammage issued Brown a retaliatory Performance Improvement Plan alleging, “[i]neffective channels of communication to staff in regard to departmental policy[,]” and need to “[i]mplement[] well thought and strategic plans and processes for the department[,]” and improvement on “staff engagement[.]”

46. The retaliatory nature of this PIP-- propounded less than a month after the DOH visit and Gammage’s threats against Brown-- was further illustrated when Gammage proved unable to sustain her quest for Brown’s “improvement” and allowed the PIP to expire by its own terms 30 days after issuance.

47. The PIP was never renewed.

**48.** Nonetheless, between April 12 and Gammage’s November 2016 firing of Brown, Gammage remained hostile to Brown.

49. On May 13, 2016, Brown and others met with the Medical Records Department and discussed Emergency Department documentation quality issues.

50. In the email summary of the meeting, the first point expressed by Kim Bussie, Senior Director Revenue Cycle Health Information Management, is confirmation of the fraudulent situation Brown had identified: failure to care for patients; doctors not signing but still billing, etc.

51. For instance, the memo notes problems with diagnoses not being determined at the time of "admission" and codes being used despite not representing a current disease or injury.

52. Around July 7, 2016, while the renovation project was underway in Emergency, Gammage falsely accused Brown of putting safety at risk.

53. On July 14, 2016, Brown emailed regarding the admissions process, resubmitting the same report as she had in March, and highlighting that she had already provided it in March 216 with no response from Gammage.

54. On July 14, 2016 Brown sent email again alleging financial fraud.

55. Then on August 3, 2016, Gammage emailed Brown an inaccurate report from a Joint Commission survey and told Brown to make monitoring and compliance of restraints in her area a priority.

56. Gammage requested that Brown develop an entire plan for compliance by August 5, just two days later, based on an inaccurate compliance report.

57. Gammage's phony report requiring Brown to audit the restraint process in the Behavioral Health Department—to which Brown was not even assigned-- was hostile and obviously retaliatory.

**Brown Raises Crash Carts Fraud Issue on August 22, 2016**

58. Fraudulent billing was also happening at HUH in connection with its "crash carts."

59. Carts are maintained with the expectation that they will contain stocks of various medicines and supplies.

60. Patients are to be charged based upon use of the supplies.

61. In order to bill for Code situations, the Code documentation sheet must be completed, referencing the charge capture crash content list which includes specific supply codes to charge patients.

62. Brown attended an August 22, 2016 "Dr. Dan" meeting, with Gammage and others in attendance.

63. Brown raised the "crash carts" issue on August 22, noting that ED was charging patients for drugs not administered and not even available on the carts.

64. Thus, she appeared with comparison lists; one of content that was supposed to be in the crash cart, and another of what was in fact in that cart.

65. Specifically, Brown compared a recent code blue documentation form to the code documentation sheet, showing that the documentation failed to justify the charges.

66. Brown told Gammage that the ED needed to be consistent with the processes followed elsewhere and throughout the organization.

67. Dr. Adams then agreed, stating that his observation was that the charging process in the Emergency Department was different; that the ED was not following the rules.

68. Gammage was quiet during this discussion.

69. Gammage knew Brown would not accept blame for unresolved violations, in part because of Brown's e-mails with her assessment and recommendations via

action plans, and also because Brown had already provided related information to DOH during the survey.

**Jim Edwards and Everett Lynn Leave in October 2016**

*70.* Prior to their departures, Gammage would have needed approval of Everett Lynn and Jim Edwards to fire Brown, as Edwards was Gammage's first-line supervisor and Lynn (ED Medical Director for Paladin) was her second-line supervisor.

*71.* Both had consistently supported Brown by recognizing the ED for improved performance at the monthly director meetings.

*72.* However, around October 1, 2016, Edwards separated as HUH President/CEO and on October 20, 2016 Lynn left such that Brown was now directly exposed to Gammage's power.

**The October 31, 2016 Meeting**

73. Brown had prepared an ED hold policy for Gammage's approval.

74. On October 31, 2016, both Gammage and Brown attended a meeting whereupon that policy was discussed.

75. An attendee asked what happened with the ED hold policy?

76. Brown responded that she had provided a policy to Gammage, who needed to address it.

77. This was apparently humiliating to Gammage, considering that her subordinates and peers were there, and it was exposed that Brown had delivered the policy—which would have addressed the rampant financial fraud associated with the ED Holds-- months earlier, right after the March 2016 DOH survey.

78. Brown explained the billing and patient safety ramifications of the team's failure to execute the change in plan.

79. Gammage attempted to save face, stating that the policy needed to be revised.

80. Gammage scheduled a meeting with Brown for later in the day, around 4:00pm.

81. Gammage was hostile at that meeting, asking Brown: "what was wrong with you?" and "why did you mention those things in the meeting."

82. Brown explained she was a little frustrated that they were still not in compliance on ED Holds when Brown's policy work had been done and all that was still needed was approvals.

83. Gammage shook her head at Brown in disapproval, snarling and said, "I'm going to follow up with the team and be in touch."

84. Brown understood that to mean Gammage was getting ready turn the tables, and make Brown the scapegoat for the ED holds situation.

**A Death in the ED Places HUH at Risk of Being Caught in Fraudulent Billing Practices**

**85.** On November 1 or 2, 2016, without further communication with Gammage, Brown flew to San Francisco SF for a pre-approved (by Ganmmage) ER training with California Emergency Physicians ("CEP").

**86.** The conference took place on November 3-4 and Brown's attendance was later referenced in her termination letter as having not been approved.

87. It is mandatory to report an ED death to the DOH. Indeed, such a sentinel event must be reported within 72 hours of occurrence.

88. On Monday November 5 or 6, 2016, while she was traveling from San Francisco to Georgia, Brown was called upon to manage the aftermath of a death that had occurred in the ED over the phone, by calling the night shift manager, attempting to ensure that tapes could be reviewed and taking other investigatory steps.

89. There happened to be a DOH meeting scheduled for shortly thereafter, Wednesday, November 9, 2016.

90. As it is DOH's practice to address both additional complaints and unresolved prior survey items while visiting the facility, and since there was already a DOH survey in process and a visit to the hospital imminent, any complaint and/or reporting to DOH regarding the death would result in a full survey, not just in follow-up of previously ongoing matters.

91. Gammage therefore knew that reporting the ED death would expose the financial frauds stemming from the ED holds and the improper crash cart procedures, and she knew Brown would be imminently blowing the whistle further.

**Gammage Wrongfully Evicts Brown From HUH**

92. November 9, 2016 was first time Gammage had seen Brown since October 31.

93. Early that morning, Brown was in her office when Gammage stormed in and demanded answers to a series of questions about Brown's whereabouts the prior day.

94. Before Brown could answer, however, Gammage shouted: "you need stay in your own damn lane" more than once. Brown managed to express that the death was her business because it happened in the emergency department, but then Gammage aggressively forced Brown out of Brown's office while shouting: "[g]et out! I don't want you here!" Gammage took possession of Brown's office keys and escorted Brown to the lobby.

95. Gammage was animated and angry.

96. The interaction lasted less than 5 minutes.

97. Gammage's timing is telling. By evicting Brown when she did, Gammage preempted Brown's anticipated reporting on compliance to the quality director, Diane Richmond, who would have then sent that damaging information to DOH for the November 9 DOH meeting.

98. Brown's report would have included that patients were still in the ED not making it to inpatient because of broken processes on the inpatient side, and that these patients were still being billed as admitted without receiving any admitted patient-type care, indeed without ever leaving the ED.

**Gammage Issues Brown a False Termination Letter**

99. On November 11, 2016, Gammage issued Brown a termination letter. Dr. Mallory Williams was the Chief of Trauma, and Brown was under his chain of command.

100. However, Williams admits that Gammage did not discuss firing Brown with him; instead Williams wrote to CEO James Diegel immediately on November 15, 2016, stating as follows:

> I have worked with Ms. Brown very closely on numerous issues and find her to be extremely competent and an overall asset to the organization. She is a champion for patient safety and quality care and has a track record of leadership within the Department of Emergency Medicine that is remarkable especially considering her overall budgetary constraints, institutional culture, and short time of employment. . .

101. Gammage's firing letter fails to allege a credible reason for firing Brown, particularly in light of the accolades she was receiving and the appreciation she has garnered even from Gammage's own Paladin superiors.

102. Notably, it alleges that other staff members' feedback provided part of the reason for the firing, but no such feedback is discussed in the letter nor is known to Brown.

103. Rather, Brown's staff undoubtedly respected and valued her.

104. The letter begins by referencing the April 12, 2016 Performance Improvement Plan, without noting that Brown successfully completed its requirements long before November.

105. The letter relies in key part upon the statement that: "[o]n October 31, you communicated to me that you were going to a conference for three days. This was arranged without prior approval."

106. However, this was a highly disingenuous reason for firing Brown.

107. Thus, as Gammage well knew, CEP (ED physician group) made arrangements for Brown's attendance while Brown was out on bereavement leave.

108. Brown informed Gammage of the arrangements when Brown returned from leave and reminded Gammage of them the day before the conference.

109. Not only did Gammage know that Brown would attend; she also verbally praised the learning opportunity before settling on using it as a pretextual firing excuse.

110. The letter also states as follows:

> On November 8, I received communication from Jarvis Hagan, ED Administrative Assistant that you would not be in the office. This information was communicated to me as a result of me inquiring about your location. I was advised that you were not coming in due to you working the night shift. I made several attempts to contact you by direct dial and text message. You did not respond. When we finally met, and I asked you why you did not respond, you stated you had issues with your cell phone.

111. In fact, this in no way reflected any misconduct or performance deficiency.

112. Brown notified Hagan that Brown was not reporting in on the night shift but made plans to work the following night.

113. The CNO directive is to call or text Gammage for "Risk" issues only. The letter further states:

> As a result, of on-going unsatisfactory work performance, a failure to adhere to operational guidelines and your inability to improve satisfaction among your staff, you are being terminated from your employment with Howard University Hospital effective November 11, 2016.

114. Tellingly, the letter fails to identify specific staff as dissatisfied, and the only record is to the contrary: that Brown was successful and valued. This theme is

repeated in the discussion of 1: 1 meetings, whereupon Gammage asserts that she addressed Brown's lack of timely responses and follow-up on issues, but Brown denies that and maintains instead that at those meetings they discussed improvements that were occurring.

115. Gammage alleges: "[u]ntimely response to requests and lack of prioritization and follow through with requests[,]" but provides no examples because there are none.

116. The same is true with regard to alleged "lack of follow-through" regarding specific organizational requirements.

117. Regarding Brown's alleged lack of communication with direct report and senior leader, again, no examples were given.

**118.** In fact, Brown was meeting regularly with Gammage—who was copied on all communication, as well as Dr. Williams, Dr. Hussain, Dr. Bell and Dr. Lynn, and Brown communicated all Action Plans and Implementation Plans with them via e-mail. Gammage's firing letter sent as an agent of both HUH and Paladin also absurdly states: "as of Nov 8, 2016, you have not received the required flu immunization, which exceeded the November 1, 2016, deadline. As a nurse leader, this is unacceptable and does not display modeling behavior." This was blatant disparate treatment: non-whistleblowers were not singled out for such treatment. They have never been terminated for failing to get a flu shot.

119. The letter also asserts that: "[o]n November 9, 2016, you also communicated to me that you did not work night shift as planned due to a late flight

arrival. As a result, the night shift had no coverage or contingency plan during your unscheduled absence."

120. This was patently false.

## VI. STATEMENT OF CLAIMS

121. Plaintiff incorporates by reference all of the above-stated paragraphs as if fully stated herein.

**Count I—Retaliation, in Violation D.C. Code § 2-381.02 et seq.**

122. Plaintiff incorporates by reference all of the above-stated paragraphs as if fully stated herein.

123. D.C. Code § 2-381.02 renders it unlawful for any person to knowingly present a false or fraudulent claim for payment approval, or to make a false record or statement material to a false or fraudulent claim.

124. § 2-381.04 forbids retaliation against an employee, contractor, agent or associated other, who acts in furtherance of efforts to stop a violation as set forth in D.C. Code § 2-381.02.

125. D.C. Code § 2-381.02 renders liability "joint and several for any act committed by 2 or more persons."

126. Plaintiff Brown was an employee, contractor, agent or associated other of both defendants, who was "discharged. . . . because of her lawful acts **to stop one or more violations of this subchapter**."

127. Defendants' termination of Brown because of her activities protected by statute violates that Act, and thereby caused Brown damages, both financial and emotional.

128. Defendants' liability is joint and several.

**<u>Count II: Retaliation in Employment Termination, in Violation of 31 U.S.C. § 3730</u>**

129. Plaintiff incorporates by reference all of the above-stated paragraphs as if fully stated herein.

130. 31 U.S.C. §3730 (h)(1) forbids retaliatory forbids retaliation against an employee, contractor, agent or associated other, who acts in furtherance of efforts to stop a violation as set forth in the federal False Claims Act, 31 USC § 3729.

131. Plaintiff Brown was an employee, contractor, agent or associated other of both Defendants, who was discharged because of her lawful to stop one or more violations of the False Claims Act.

132. Defendants' termination of Brown because of her activities protected by the federal False Claims Act violates that Act, and thereby caused Brown damages, both financial and emotional.

133. Under the False Claims Act, "where two or more persons have engaged in fraud against the government in violation of the Act, each person is held to be "jointly and severally liable for the … statutory penalty." *United States ex rel. Abbott-Burdick v. Univ. Med. Assocs.*, No. 2:96-1676-12, 2002 U.S. Dist. LEXIS 26986, at *18 (D.S.C. May 23, 2002).

134. Accordingly, Defendants' liability for the retaliatory firing of Brown is joint and several.

## VII. REMEDIES

**WHEREFORE**, the Plaintiff prays that the Court grant her the following relief:

a. A declaratory judgment that Defendant's conduct violated her rights;

b. An order from this Court restoring her to her position at HUH, or reasonable front pay in the alternative;

c. Backpay for all employment income lost as a result of the firing.

d. Two times the amount of the lost pay in accordance with D.C. Code § 2-381.04 and 31 U.S.C. §3730 (h)(1), for retaliatory termination.

e. Compensatory damages against Defendants, for emotional, non-pecuniary harm resulting as a consequence of Defendant's unlawful actions, in a precise amount to be determined by the jury;

f. Compensatory damages, for consequential financial harms incurred by Plaintiff as a result of Defendants' unlawful actions, including but not limited to lost wages and benefits, including overtime pay, and future lost wages and benefits;

g. Punitive damages in an amount to be determined by the jury;

h. Prejudgment and post-judgment interest;

i. Reasonable attorneys' fees, expenses and costs, as specifically authorized by statute, to be calculated by the Court pursuant to the established procedures and precedents; and

j. Such further and other relief as the court shall deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all issues so triable.

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC

/s/

Leizer Z. Goldsmith D.C. Bar No. 419544
5335 Wisconsin Avenue, N.W., Suite 440
Washington, D.C. 20015
Telephone: (202) 895-1506
Facsimile: (202) 318-0798
Counsel for Plaintiff Sharonda Brown